FILED

07/30/2021

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 2, 2021

IN RE SOPHIA S. ET AL.

Appeal from the Juvenile Court for Sullivan County
No. BCJ16978, BCJ17218      Randy M. Kennedy, Judge

_____

No. E2020-01031-COA-R3-PT

_____

A mother appeals the termination of her parental rights to her two children. The juvenile court concluded that there was clear and convincing evidence of severe abuse by the mother and that termination was in the children's best interests. On appeal, the mother challenges whether there was clear and convincing evidence to support the court's best interest determinations. In weighing the statutory best-interest factors, she contends the trial court did not properly consider her completion of permanency plan requirements and nearly fifteen months of drug-free tests. The mother also complains that she was denied contact with her children by court order shortly after their removal and, despite her progress, was thwarted in her efforts to reestablish contact. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which KENNY W. ARMSTRONG and KRISTI M. DAVIS, JJ., joined.

Daniel J. Cantwell, Kingsport, Tennessee, for the appellant, Ashley S.

Herbert H. Slatery III, Attorney General and Reporter; and Lexie A. Ward, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

# OPINION

## I.

### A.

In March 2019, the Tennessee Department of Children's Services ("DCS") received a referral that twenty-four-day-old Eliana S. and five-year-old Sophia S. were endangered and drug exposed. The referral came from officers of the Bristol Police Department. The officers were responding to a call of a purported break-in at the apartment the children shared with their parents, Ashley S. ("Mother") and Joshua S. ("Father").

When members of the Office of Child Safety arrived, they found a home in disarray. Trash and food items were everywhere. In the living room there were whole pills, crushed pills, and drug paraphernalia. Furniture was turned upside down; there were holes in the wall, broken doors, and the bathtub was filled with water that was almost black.

Mother would later recount that she called the police at Father's insistence. Father believed someone had broken into the apartment via the basement, although the apartment had no basement. Father described himself as "really paranoid at the time." Due to delusions of people coming into the apartment, he would secure himself and the family in the apartment by using an impact driver to screw the front and back doors shut.

Mother admitted to the members of the Office of Child Safety that she had used methamphetamine earlier in the day and that she did so in the children's presence. She consented to a drug screen, which was positive for methamphetamine. Father later testified that he had used methamphetamine and a little bit of marijuana that day. Police placed Mother and Father under arrest.

DCS attempted to get the parents to agree to an immediate protection agreement for the children. Unable to obtain the consent of both, DCS petitioned the Juvenile Court of Sullivan County for temporary legal custody based on dependency and neglect. Relying on the allegations contained in a verified petition, the court awarded temporary custody to DCS the same day.

A series of hearings followed in which Mother asked for, but was denied, visitation with her children. At the first hearing following the filing of the petition, based on Mother's failed drug screen and her admission of recent drug use, the juvenile court determined that neither parent should have contact with the children until they could "pass two random consecutive drug screens."

Two weeks later, Mother again requested visitation. DCS and the court-appointed guardian ad litem (the "GAL") opposed the request. Based on arguments of counsel and

the petition filed by DCS, the court found "the parents shall have no visitation with the children until further order of this Court." The process repeated two months later with the court again denying Mother's request for visitation.

In the interim, DCS had hair follicle drug tests performed on Mother and the children. As anticipated, Mother's test was positive for methamphetamine. Sophia's sample was negative for illegal substances, but Eliana's hair sample came back positive for methamphetamines, amphetamines, and THC.[1] The level of methamphetamine was especially high for such a young child.

In July 2019, the GAL petitioned the juvenile court to terminate the parental rights of Mother and Father. *See* Tenn. Code Ann. § 36-1-113(b)(1) (Supp. 2019) (granting "the child's guardian ad litem . . . standing to file a petition . . . to terminate parental . . . rights"). Later that month, the court held a hearing in the dependency and neglect matter. The parties agreed to continue the adjudicatory hearing to coincide with the hearing on the petition to terminate parental rights. *See* Tenn. R. Juv. P. 307(a). The court also noted that Mother again requested visitation with the children. But, in light of the GAL's opposition and the results of Eliana's drug screen, the court kept its previous no contact order in place.

B.

With leave of the juvenile court, DCS joined in the GAL's petition to terminate parental rights.[2] The only statutory ground asserted against Mother for terminating her parental rights was that she had committed severe child abuse.[3] The court held a trial over two separate days in February and June 2020. Multiple witnesses testified: Mother; Father; a representative of the company that performed drug testing on Mother and the children; members of the Office of Child Safety; a forensic interviewer with the Children's Advocacy Center of Sullivan County; Sophia's therapist; the DCS case manager; one of the foster parents; and representatives from the drug treatment program that Mother completed.

Mother and Father both acknowledged a history of drug use. In Father's case, he admitted to having a substance abuse problem, specifically with methamphetamine, "on

---

[1] Tetrahydrocannabinol or THC "is a marijuana metabolite." *Interstate Mech. Contractors, Inc. v. McIntosh*, 229 S.W.3d 674, 677 (Tenn. 2007).

[2] With its motion seeking to join the GAL's petition, DCS filed a petition in support of the GAL's petition that alleged additional statutory grounds for terminating parental rights. On the first day of trial, DCS voluntarily withdrew the additional grounds for termination in the face of objections from both Mother and Father.

[3] As only Mother has appealed, our discussion focuses on the termination of Mother's parental rights.

and off" for approximately ten years. He had been convicted of charges related to the production of methamphetamine in Bristol, Virginia, in 2007. Mother recalled that she started using methamphetamine in 2017.

Before moving to Tennessee, Mother's and Father's drug use resulted in the intervention of the Virginia Department of Social Services. In October 2017, at the Department's behest, the parents agreed to place Sophia with her maternal grandmother. Mother estimated that the child was removed from their custody for "a year and a half or two, something like that."

Mother and Father also acknowledged a history of domestic violence. Father claimed that he had been the victim of violence at the hands of Mother. In September 2018, Mother was convicted of domestic assault in Virginia and served thirty days in jail. For her part, Mother claimed that she was the victim of both mental and physical abuse at the hands of Father. She explained that the incident that resulted in her 2018 domestic assault conviction was an act of self-defense.

Mother testified that she stopped using illegal drugs when she learned that she was pregnant with Eliana, about three or four months into the pregnancy. Approximately a month before Eliana's birth, Mother and Father regained custody of Sophia.

Mother admitted using methamphetamine the day of the children's removal. She started using again about a week prior, smoking methamphetamine "approximately two times . . . prior to the night that the police arrived at the home." She knew that it was dangerous for the children to be in the home while she and Father used drugs. When she and Father intended to use drugs, Mother said she tried to find someone to take the children. And, if she was unable to find someone, Mother and Father would make a point of using methamphetamine in the bathroom and away from the children.

The day of the children's removal was one of those occasions in which Mother was unable to find someone to care for the children. She was not able to get the children out of the home because Father had screwed the doors shut. So Mother and Father used methamphetamine while the children were in the home. Mother revealed to a member of the Office of Child Safety that she had used methamphetamine while holding Eliana.

Both parents were arrested. Mother pleaded guilty to charges of attempted child neglect, simple possession, and unlawful drug paraphernalia and served forty-five days in jail. She was still on probation at the time of trial.

After her release from jail, Mother moved to a sober living facility. There, she worked on the requirements of a permanency plan that had been developed by DCS. The director of the faith-based treatment and mental health provider through which Mother sought services testified that Mother had taken advantage of every opportunity the provider

4

offered. Mother "lived in . . . [the program's] home for women and children with very intense guidelines." And Mother "accomplished a whole lot, overcoming addiction, gaining employment, taking care of her physical health, her legal matters, getting a car, her own apartment, and [wa]s still very connected [to the program]." Mother was even volunteering and assisting other women in the program by providing them transportation and helping them find jobs.

The director of Mother's drug treatment program, which was geared specially to women with drug-exposed babies, testified that Mother had completed an intensive outpatient program and had availed herself of substance abuse counseling. Mother "had basically weekly observed drug screens and had several hair follicle tests" over a period of 16 months. All the screens and tests came back negative for drugs.

The DCS case manager, who had been involved with the children since their removal, acknowledged that Mother had worked hard and basically completed the requirements of the permanency plan. Mother was working and had remained sober. But, she had yet to satisfy the housing requirement. Her one-bedroom apartment was not large enough for the two children. And, despite the fact that Mother seemed to be functioning well individually, the case manager expressed concern about Mother's ability to parent. During the course of the case, Mother never had any questions for the foster parents regarding Sophia's progress or well-being nor did she express an interest in the welfare of her children while in meetings with the case manager and the foster parents. In the case manager's view, Mother considered herself "a victim of the circumstances that happened in the home" and was only interested in taking baby steps toward reunification with children.

There was significant trial testimony related to the well-being of Sophia following removal from the parents' custody. When she arrived in home of the foster mother, Sophia was five. Her clothes did not fit and her shoes did not have soles. She was also covered in bug bites.

At the foster home, Sophia would not sleep in a bed because she had not slept in one before. For the first three months, she would only sleep in a tent in her room. When she went to bed, the foster parents had to close all the latches in the room, and the foster father had to walk around outside the house to confirm for the child that no one was there. The foster parents had to get her potty trained. She occasionally wet her bedding when something "trigger[ed] her." Sophia also hoarded food when something triggered her anxiety. The foster mother described the child as "fearful of . . . life in general."

With the foster mother, Sophia rarely spoke of Mother and Father, but when she did, it was never in a positive way. And such talk often resulted in adverse reactions, like "sleepwalking." The foster mother described such instances as, not just getting up and walking through house:

[Sophia] is up in pure fear. And she is crying, and she, you can't redirect her. She's not easily consoled. And she will stand. She either stands at our bedroom door, or she has even walked over to my side of the bed. And she is just bawling. You cannot redirect her. And she will finally turn. And she'll get to my door and she'll say, they can't take me. They can't take me.

According to foster mother, anytime Mother and Father were mentioned, there would be a setback.

Sophia's therapist, who began seeing the child about a month after her removal, testified that Sophia's behavior regressed when she was frightened. The child described "barricad[ing] herself in her room" to her therapist out of fear that she would be returned to her former home.

Both the foster mother and the DCS case manager related memories that Sophia shared of her former life. As the DCS case manager testified,

You name it, [Sophia has] said it. She's talked about her dad is a damn dirty liar, because he lied to the neighbor, and the neighbor shot a gun through the house and there were holes in the wall. She's talked about mommy biting daddy, and daddy bleeding. Daddy biting mommy, and mommy bleeding. Mommy and daddy hitting each other. She has shown me how to physically take happy medicine up my nose, and how that works, and how her parents would do that. . . . She has told me how I can break into a house with a card, a credit card, she has told me how I can do that. Sometimes you have to do that to get in people's windows is what she'll say.

Sophia told the foster mother about seeing "sharps . . . on tables." And Sophia "talked about her mom would cook things for parties that they were going to have, but she wasn't allowed to eat any of them." She also "talked about there being an egg smell, like a rotten egg smell, in the home." A video recording of an interview of Sophia conducted by the Children's Advocacy Center of Sullivan County included the same or similar statements from the child.

As for Sophia's younger sister, the foster mother said, at first, Eliana did not sleep at all and would constantly cry. She could not be soothed. The child shook, and her lips quivered. Eliana also would not eat and had horrible bowel movements. The child had

6

difficulty swallowing and once choked on mashed potatoes. She was subsequently diagnosed with torticollis.[4]

After the trial, the court terminated the parental rights of both parents. The court concluded that there was clear and convincing evidence that Mother and Father had "committed severe child abuse against the children by knowingly exposing the children to methamphetamine." It also concluded that there was clear and convincing evidence that termination was in each child's best interest. In reaching its conclusion, among other things, the court found "that the parents seem to have no understanding of the level of trauma the children have suffered and no concept of what is in the children's best interest."

## II.

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g) (2017).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1) (Supp. 2019). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions

---

[4] Torticollis refers to a "[s]tiff neck associated with muscle spasm, classically causing lateral flexion contracture of the cervical spine musculature." *See Torticollis*, TABER'S CYCLOPEDIC MEDICAL DICTIONARY (21st ed. 2009).

drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

## A.

On appeal, Mother argues only that the juvenile court "erred in finding that terminat[ion] . . . is in the child's best interest." Although Mother does not challenge the statutory ground for terminating her parental rights, we "must review the trial court's findings as to each ground for termination . . . regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016).

The juvenile court found the GAL and DCS had proven severe child abuse as a ground for termination by demonstrating that Mother "knowingly exposed the children to methamphetamine which is likely to cause serious bodily injury or death." Under Tennessee Code Annotated § 36-1-113(g)(4), a parent's rights may be terminated if "[t]he parent . . . has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights . . . to have committed severe child abuse against any child." Tenn. Code Ann. § 36-1-113(g)(4). Among other things, "severe child abuse" under Tennessee Code Annotated § 37-1-102 means "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death." *Id.* § 37-1-102(b)(27)(A)(i) (Supp. 2019).[5]

Generally, "[c]lear and convincing evidence of severe child abuse is present when a child is exposed to methamphetamine." *In re Caydan T.*, No. W2019-01436-COA-R3-

---

[5] DCS argues that Mother's conduct also falls within another definition of "severe child abuse." Under subsection (E) of Tennessee Code Annotated § 37-1-102(b)(27), severe child abuse also includes "[k]nowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child . . . ." Tenn. Code Ann. § 37-1-102(b)(27)(E). But the petition to terminate parental rights did not cite to this definition, and the court did not rely on it.

PT, 2020 WL 1692300, at *5 (Tenn. Ct. App. Apr. 7, 2020) (citing *In re A.L.H.*, No. M2016-01574-COA-R3-JV, 2017 WL 3822901, at *5 (Tenn. Ct. App. Aug. 31, 2017) ("This Court has repeatedly held that exposure of a child to drugs constitutes severe child abuse.")).  Here, Mother admitted using methamphetamine in the presence of her children. And Eliana's hair follicle sample tested positive for methamphetamine, amphetamines, and THC.

We conclude that the evidence clearly and convincingly supports the finding that Mother committed severe child abuse.  Mother's admitted methamphetamine use with Father while the children were in the home falls within the definition of severe child abuse. She knowingly exposed and failed to protect her children from a substance that was likely to cause them serious bodily injury or result in death.

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests."  *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005).  So even if a statutory ground for termination is established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interests.  Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts must consider in making a best interest analysis.  The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis."  *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017).  In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers."  *Id.* at 682.  But it is not necessary to "find the existence of each enumerated factor . . . [to] conclude that terminating a parent's parental rights is in the best interest of a child."  *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005).

The best interest analysis is a fact-intensive inquiry, and each case is unique.  *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).  The relevancy and weight given the statutory factors may vary, and  "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis."  *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005).  What does not vary from case to case is the focus of the analysis.  The focus is on what is best for the child, not what is best for the parent.  *In re Marr*, 194 S.W.3d at 499.  Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests."  *In re Carrington H.*, 483 S.W.3d at 535.

The juvenile court determined that it was in the best interest of both Sophia and Eliana to terminate Mother's parental rights. On appeal, Mother argues that the court erred in weighing all the statutory best-interest factors save one — the sixth factor. Under that factor, the court determines whether the parent or another person residing with the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child" or another person in the home. Tenn. Code Ann. § 36-1-113(i)(6). The court found the sixth factor weighed in favor of termination, and on appeal, Mother concedes that she "may be guilty of severe abuse against Eliana."

As for the remaining factors, Mother contends that the first two statutory factors weighed against termination of her parental rights. Those factors examine the parent's current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home." *Id.* § 36-1-113(i)(1). The second factor considers the parent's potential for lasting change. *See id.* § 36-1-113(i)(2) (asking "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible"). We agree that the proof established that Mother had made an adjustment of circumstance, conduct, or conditions. Since her children's removal, her progress has been commendable. But it does not follow that it was safe or in the children's best interest to be returned to Mother's home. The proof showed that Sophia expressed considerable anxiety and fear about returning to Mother. On the other hand, Mother appears to have made a lasting adjustment to her life.

The third and fourth factors focus on the parent's relationship with the child. The third factor focuses on the consistency of visitation. *See id.* § 36-1-113(i)(3). Mother notes that she was never granted visitation after the removal of her children. But the juvenile court did not weigh lack of visitation for or against Mother.

The court did weigh the fourth factor against Mother. The fourth factor considers "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). Mother complains that it was unfair to weigh this factor against her because she was not permitted visitation. She claims she was denied the opportunity to establish a relationship with her children. But Mother's argument ignores her prior history with drugs. Sophia was removed from Mother's custody for at least 15 months prior to the juvenile court granting DCS temporary custody. And Eliana was only weeks old when she was removed. The foster parents are the only parents Eliana has known. We agree with the juvenile court that the fourth factor weighs in favor of termination.

The fifth factor evaluates the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). Since their placement with the foster parents, Eliana and Sophia have made great strides in their

10

development. Eliana was being treated for her torticollis and was in therapy. She was able to walk and crawl and was hitting her developmental milestones. Sophia was doing well in school and reading at grade level. Sophia told the DCS case manager that she loved her foster parents and wanted to stay with them because they would keep her safe and take care of her. On the other hand, the testimony was consistent that Sophia feared being returned to Mother. Even the possibility of being returned elicited strong negative reactions from the child. The fifth factor favored termination.

The seventh factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner."). Mother had established a home. Although the DCS case worker testified that her apartment was too small to care for both children, Mother testified that she could obtain a larger apartment. Conflicting testimony was presented regarding Mother's ability to be a safe and stable caregiver.

The last two factors weighed against terminating Mother's parental rights. The eighth statutory factor evaluates the parent's mental and emotional health, asking "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child." *Id.* § 36-1-113(i)(8). The ninth factor looks at the parent's child support history. *See id.* § 36-1-113(i)(9). The only evidence concerning Mother's present mental and emotional status was positive. And Mother paid child support as ordered.

Here, the combined weight of the proven facts amount to clear and convincing evidence that termination is in both Sophia's and Eliana's best interest. While some of the statutory factors might favor maintaining the parent-child relationship, the best interest analysis is not an exercise in determining "whether the sum of the factors tips in favor of or against the parent." *White*, 171 S.W.3d at 194. From the children's perspective, their interests are best served by allowing them to remain in an environment where they are thriving. For Sophia in particular, who has grown attached to the foster parents, any reunification with Mother would be difficult at best. And we agree with the juvenile court that Mother did not appreciate the trauma Sophia experienced in Mother and Father's home.

## III.

The record contains clear and convincing evidence to support the finding that Mother committed severe child abuse. And the record contains clear and convincing evidence that termination is in the children's best interest. So we affirm the termination of Mother's parental rights.

_____s/ W. Neal McBrayer_____
W. NEAL McBRAYER, JUDGE